*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0364P (6th Cir.)
File Name: 00a0364p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

FEDERAL DEPOSIT INSURANCE
CORPORATION,
       *Plaintiff-Appellee,*

     *v.*

FIRST HEIGHTS BANK, FSB;
PULTE DIVERSIFIED
COMPANIES, INC.; PULTE
CORPORATION,
       *Defendants-Appellants.*

No. 99-1355

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 95-72722—John Corbett O'Meara, District Judge.

Argued: April 25, 2000

Decided and Filed: October 12, 2000

Before: MARTIN, Chief Judge; MERRITT and SILER,
Circuit Judges.

---

**COUNSEL**

**ARGUED:** John G. Roberts, Jr., HOGAN & HARTSON, Washington, D.C., for Appellants. Kirk K. Van Tine, BAKER & BOTTS, Washington, D.C., for Appellee. **ON BRIEF:** John G. Roberts, Jr., HOGAN & HARTSON, Washington, D.C., Norman C. Ankers, Robert M. Jackson, Raymond M. Kethledge, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, Stephen F. Wasinger, WASINGER, KICKHAM & KOHLS, Royal Oak, Michigan, for Appellants. Kirk K. Van Tine, David A. Super, Kelly R. Donovan, BAKER & BOTTS, Washington, D.C., Jaclyn C. Taner, FEDERAL DEPOSIT INSURANCE CORPORATION, Washington, D.C., Kathryn R. Norcross, Washington, D.C., for Appellee.

---

**OPINION**

---

   BOYCE F. MARTIN, JR., Chief Judge. The Federal Deposit Insurance Corporation (FDIC) initiated this litigation in 1995, alleging breach by the Pulte Corporation, Pulte Diversified Companies, Inc., and First Heights Bank (whom we will refer to collectively as the Pulte Group[1]) of the Assistance Agreement and subsequent contracts governing the acquisition of failed thrifts during the savings and loan crisis of the 1980s. The FDIC filed multiple summary judgment motions claiming that the Pulte Group violated: (1) section 9

---

   [1]When entering into contracts with the FDIC, Pulte Diversified Companies, Inc. created First Heights Bank to serve as a separate corporate entity. The contracts between the FDIC and Pulte Diversified Companies, Inc. were all negotiated by the Pulte Corporation, Pulte Diversified Companies, Inc.'s parent company. Because only one group of parties will benefit or be held accountable, and because they use various separate corporate entities, we will generally refer to them as the Pulte Group.

of the Assistance Agreement, requiring the Pulte Group to share with the FDIC twenty-five percent of the tax savings they realize from the FDIC-related transactions; (2) section 3(b)(6) of the Assistance Agreement, requiring a payment to the FDIC equal to twenty-five percent of any dividends distributed to First Heights shareholders; and (3) section 18(e), under which the FDIC seeks damages for diminution in the value of its stock warrants.   The Pulte Group counterclaimed, alleging that the FDIC, not them, had breached the agreements.   The district court granted the FDIC's summary judgment motions.   The Pulte Group appeals the district court's decision to grant the motions and the district court's damages award.   We AFFIRM in part, REVERSE in part, and REMAND to the district court for a decision in accordance with this opinion.

## I.

Between 1981 and 1983, as a result of high interest rates and inflation in the 1980s, many savings and loans, or "thrifts," failed.[2]   To prevent further losses, the Federal Savings and Loan Insurance Corporation,[3] the FDIC's predecessor, whose responsibility it was to insure thrift deposits and to regulate all federally insured thrifts, looked to healthy thrifts and outside investors to take over ailing thrifts. As an inducement to acquire the ailing thrifts, the acquiring entities were given certain tax benefits that would allow them

---

[2] In *United States v. Winstar Corporation*, 518 U.S. 839 (1996), the Supreme Court provides a more extensive history of the savings and loan crisis.

[3] In 1989, the Federal Savings and Loan Insurance Corporation was abolished by the enactment of the Financial Institutions Reform, Recovery and Enforcement Act, Pub. L. No. 101-73, 103 Stat. 183 (codified as amended in scattered sections of 12 U.S.C.).  Under the Act, the FDIC became responsible for the assets and liabilities of the Federal Savings and Loan Insurance Corporation.  The FDIC, rather than the Federal Savings and Loan Insurance Corporation, is therefore a party to this action.

to meet their reserve capital requirements under federal regulations.[4]

Pulte Diversified Companies, Inc., a wholly-owned subsidiary of Pulte Corporation, entered into multiple agreements with the FDIC to acquire five savings institutions. To carry out the transaction, Pulte Diversified Companies created a new subsidiary, First Heights Bank, to assume the liabilities of the insolvent thrifts in exchange for financial assistance from the FDIC. On September 9, 1988, under the Assistance Agreement, First Heights agreed to purchase the assets and assume certain liabilities of four failed thrifts. The Assistance Agreement was amended on September 23 to include the purchase of a fifth institution.

The FDIC's financial assistance to First Heights encompassed reimbursements for certain losses. Most of the assets of the thrifts were conveyed to First Heights at book values that exceeded the assets' fair market values. These assets were defined as covered assets. Because First Heights would be required to liquidate covered assets at a loss, the FDIC agreed to reimburse First Heights for these losses. Under the Internal Revenue Code, such reimbursements were not considered taxable income.

As an additional incentive to purchase thrifts, the Internal Revenue Code provided other tax benefits to the entities acquiring the failed savings and loans. Under the Internal Revenue Code, First Heights could use the covered assets losses to reduce its taxable income by deducting the losses from gross income. First Heights thus received two tax benefits related to the covered asset losses: it was allowed to use the covered asset losses to reduce taxable income without also recognizing as income the FDIC's loss reimbursements.

---

[4]These benefits were dramatically reduced by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, which imposed stricter capital requirements on all savings institutions. By disallowing the inclusion of certain assets when determining core capital, many institutions fell out of compliance with federal regulations.

money held by the FDIC after the district court's judgment is entered.

## VIII.

For the foregoing reasons, we remand to the district court for a decision in accordance with this opinion.

calculated under the statutory provision. Under the former article 5069-1.03, this interest accrues at a rate of six percent a year, starting thirty days after the amount becomes due.

For the tax benefit sharing payments arising in 1988 through 1995, the prejudgment interest accrued thirty days after the payments for each year were due. The violations of 3(b)(6) and 18(e) occurred on December 30,1994, the date of the amendment to the Tax Allocation and Sharing Agreement and the recission of the Warrant Obligation Assistance Agreement; because the amounts due for these breaches came due on the day of breach, prejudgment interest should accrue from January 29, 1995. The prejudgment interest on these amounts should be calculated at six percent per year through September 1, 1997. After the amendment to the Texas statute, prejudgment interest on this contract became non-statutory prejudgment interest, accruing under *Johnson & Higgins* at the rate of postjudgment interest, or ten percent.

For the tax sharing payments that became due after September 1, 1997, prejudgment interest accrues at the rate of 10%. Under *Johnson & Higgins*, the accrual date is dependent on the date of written notice of a claim or the date suit is filed. In the present case, this would provide for a 1993 accrual date on amounts not due until years later. The Texas Supreme Court, in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 551-52 (Tex. 1985), explained the concept of prejudgment interest thus: "Interest as damages in compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and date of judgment." In this case, the FDIC cannot assert it lost the use of the money before that money was even due. Therefore, for amounts becoming due in 1997, 1998, and 1999, the prejudgment interest should accrue only from the date on which the amounts became due.

Finally, we do not address the issue of the Pulte Group's right to offset the judgment by the amounts owed to it by the FDIC. We trust that the parties will properly account for the

In exchange for the FDIC's financial assistance, First Heights agreed to share with the FDIC certain tax benefits resulting from the Assistance Agreement.

Also on September 9, the FDIC entered into the Warrant Agreement with First Heights. The Warrant Agreement issued warrants that allowed the FDIC to purchase twenty percent of the outstanding shares of First Heights's common stock, at one cent per share. The FDIC had the option to exercise this right between September 8, 1998 and September 9, 2003. Under the Warrant Agreement, the FDIC could request the market value of twenty percent of First Heights's outstanding common stock instead of purchasing the stock.

In 1989, First Heights entered into a Tax Allocation and Sharing Agreement with the Pulte Group in which the Pulte Group agreed to fund First Heights's tax benefit sharing obligations to the FDIC. In exchange, First Heights agreed to file tax returns as a member of the Pulte Group, allowing the Pulte Group to utilize First Heights's deductions and exclusions and thereby reducing the Pulte Group's tax liability. As a result of the Tax Allocation and Sharing Agreement, First Heights recorded on its books no net liability to the FDIC for tax benefit sharing in the tax years 1988 - 1994. Instead, the Pulte Group recorded the tax benefit sharing obligations on its books as a liability. According to the Pulte Group, the accrued but unpaid tax benefit sharing liability to the FDIC totaled $48.1 million as of the end of 1994.

First Heights and the Pulte Group executed an amendment to the Tax Allocation and Sharing Agreement dated December 30, 1994. The amendment rescinded retroactively, through tax year 1988, the Pulte Group's obligation to fund First Heights's tax benefit sharing obligations to the FDIC. The Pulte Group maintained the benefit from First Heights's tax deductions and exclusions, deleting $48.1 million of tax sharing liability from its books and recording $452,188 receivable from First Heights. To account for the

cancellation, First Heights registered a liability on its books, thereby reducing its retained earnings by $48.6 million.

In a second transaction dated December 30, 1994, the Pulte Group and First Heights rescinded the Pulte Group's obligation to redeem the FDIC's warrants. The Pulte Group had assumed First Heights's warrant obligation on December 30, 1988 under a separate agreement. To account for this, First Heights removed the warrant obligation liability from its books and the Pulte Group recorded that liability. When the Pulte Group and First Heights canceled this obligation, the economic burden of the warrant obligation returned to First Heights. First Heights recorded a $4.4 million decrease in retained earnings to reflect the cancellation of the Pulte Group's contractual obligation to redeem the warrants. The Pulte Group made a corresponding reduction to its liabilities.

## II.

This Court reviews summary judgment *de novo*. *See Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir. 1996). If there is no genuine issue of material fact, a movant may be entitled to judgment as a matter of law. *See id.* The party moving for summary judgment bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence offered] must be reviewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## III.

The FDIC seeks to enforce section 9 of the Assistance Agreement, which requires First Heights to share with the FDIC twenty-five percent of the tax savings realized as a result of the Assistance Agreement. The main issue in this case is the ambiguity of the Assistance Agreement. The Assistance Agreement is governed under Texas law, which states that if a contract is written so that "it can be given a certain or definite legal meaning or interpretation," it is not ambiguous and must be construed according to that meaning

If a creditor has not agreed with an obligor to charge the obligor any interest, the creditor may charge and receive from the obligor legal interest at the rate of six percent a year on the principal amount of the credit extended by the creditor to the obligor beginning on the thirtieth day after the day on which the amount is due.

Tex. Fin. Code Ann § 302.002 (Vernon's Supp. 2000) (formally codified at Tex Rev. Civ. Stat. art. 5069-1C.002). We have no guidance from the Texas courts as to the effect of this amendment. It appears to us that the changes to this provision and other sections of the Credit Title remove prejudgment interest from the interest authorized by the statute. If no longer authorized by statute after September 1, 1997, prejudgment interest on ascertainable sum contracts must now be governed by non-statutory interest rules.

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998), thus controls, as its principles extend to interest in breach of contract judgments not covered by a statutory interest provision. The Texas Supreme Court, seeking to equate common law prejudgment interest rules with legislative ones, ruled in *Johnson & Higgins* that non-statutory prejudgment interest accrues at a rate equal to postjudgment interest from the earlier date of 180 days after a defendant receives written notice of a claim or the date suit is filed and is computed as simple interest. *See id*. at 531-33.

The Assistance Agreement is a contract "ascertaining the sum payable" as covered by the former statutory prejudgment interest provision. In *Great American v. North Austin Municipal Utilities District No. 1*, 950 S.W.2d 371, 373 (Tex. 1997), the Texas Supreme Court explained that the statutory prejudgment interest provision applies to contracts that "fix[] a measure by which the sum payable can be ascertained with reasonable certainty in light of the attending circumstances." Sections 9, 3(b)(6), and 18(e) of the Assistance Agreement each provide a method for calculating the damages due to the FDIC. Therefore, the prejudgment interest that accrued prior to the September 1, 1997 amendment of the statute should be

agreements. This agreement was signed by both parties, and thus the intent behind the document, along with the general rule, indicates that both Pulte Diversified Companies, Inc. and First Heights are liable.

## VII.

In diversity cases in this Circuit, federal law controls postjudgment interest but state law governs awards of prejudgment interest. *See Clissold v. St. Louis-San Francisco Rwy. Co.*, 600 F.2d 35, 39 n.3 (6th Cir. 1979). Texas law complicates the application of this seemingly simple rule, making the rate of some prejudgment interest dependent upon the applicable rate of postjudgment interest. We find it necessary to defer to the conclusion of our sister circuit on this peculiar issue of Texas law. Therefore, we will adopt the Fifth Circuit's rule that in a diversity case the applicable state postjudgment rate should be used in arriving at the rate of prejudgment interest under Texas law. *See Harris v. Mickel*, 15 F.3d 428, 431-32 (5th Cir. 1994). However, federal law will still govern any postjudgment interest in the case at bar.

The law of prejudgment interest in Texas is convoluted. There are multiple sources of prejudgment interest, and recent amendments to the Texas statutes muddle, rather than clarify, the rule for the present case. Historically, statute governed prejudgment interest for contracts "ascertaining the sum payable." *See Great American Ins. Co. v. North Austin Munic. Util. Dist. No. 1*, 950 S.W.2d 371 (Tex. 1997). These provisions provided for the following interest:

> When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

Tex. Rev. Civ. Stat. Ann. art. 5069-1.03 (Vernon's 1996) (repealed by Acts 1997, 75th Leg., Ch. 1396, § 48). The legislature, however, repealed this statute on September 1, 1997 and replaced it with the following provision:

---

or interpretation as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If the contract is unambiguous, the moving party would be entitled to judgment if there is no other disputed matter. *See id.* at 394.

To determine whether a contract is ambiguous, the court must look at the contract as a whole, considering the circumstances present when the contract was created. *See id.* at 394. "[T]he primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Id.* at 393. To achieve this, the court must give effect to all provisions of the contract so that none will be rendered meaningless. *See id.* "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.*

The FDIC and the Pulte Group agreed to share the tax benefits arising from the FDIC's financial assistance to First Heights. Section 9 of the Assistance Agreement governs which tax benefits the Pulte Group must share with the FDIC. Specifically, it defines items that generate tax benefits, the tax detriment items that may offset tax benefits, and the formulas for calculating the allocation of net tax benefits between the FDIC and the Pulte Group.

Section 9(a) expressly defines the tax benefits that are to be shared with the FDIC:

> § 9 *Tax Benefits*. For each taxable year . . . the ACQUIRING ASSOCIATIONS shall credit to Special Reserve Account I . . . an amount equal to the sum of the Indemnification Net Tax Benefits . . ., the Federal Net Tax Benefits (as defined and calculated in accordance with § 9(d)) and the State Net Tax Benefits . . ., if any, realized by the ACQUIRING ASSOCIATIONS in any year (collectively "Net Tax Benefits").
>
> (a) *Tax Benefit Items*. For purposes of this Agreement, the Net Tax Benefits shall be the tax benefits that are attributable to the items described in § 9 (a)(1), (2), (3), and (4) below ("Tax Benefit Items") and that are actually

utilized by an ACQUIRING ASSOCIATION, or the consolidated group . . . to reduce its Federal or state income tax liability in a given tax year, by virtue of a Tax Benefit Item being a tax deduction or being excludable from income for such tax year, as calculated in § 9(c), (d) and (e) below:

(1) The amount of any net operating loss carryovers; any capital loss carryovers and any other loss carryovers of any ACQUIRED ASSOCIATION at the Effective Date, resulting in a tax deduction from either ACQUIRING ASSOCIATION's gross income;
. . .

(3) Any cost, expense or loss (i) which is incurred by an ACQUIRING ASSOCIATION, (ii) for which the CORPORATION has made assistance payments . . . to the ACQUIRING ASSOCIATION pursuant to § 3 (a) of this Agreement . . ., and (iii) which is deductible on an Acquiring Association's Federal or state income tax return or reduces the balance of the ACQUIRING ASSOCIATION'S bad debt reserve but only to the extent such reduction would result in a tax deduction on the experience method . . . .

Section 9(d) calculates the amount of the Federal Net Tax Benefits by determining the difference between (1) First Heights's federal tax liability with the tax benefit items and (2) the hypothetical tax liability, the tax liability of First Heights without the tax benefit items. Section 9(d) provides, in pertinent part:

Federal Net Tax Benefits for a taxable year shall be the Taxable Percentage multiplied by an amount equal to the excess, if any, of:

(1) the Federal income tax liability for such taxable year . . . which would have been incurred by the ACQUIRER and the ACQUIRING ASSOCIATIONS, or the Consolidated Group, (i) if the Tax Benefit Items described in § 9(a)(1), (3), and (4) had not been

their respective transferees, successors, and assigns, but, except as otherwise specifically provided in this Agreement, this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

The district court held that this section is a standard non-assignment clause with no bearing or limiting effect on the liability of Pulte Diversified Companies, Inc. Together with section 9, it appears to indicate nothing more than that First Heights Bank and Pulte Diversified Companies, Inc. are to "contribute separately to the entire result" which, according to the passage from the Corbin treatise quoted above, is insufficient to override the presumption of joint obligation.

The argument of the Pulte Group relies on the unpublished district court opinion of another jurisdiction to depart from the general rule that co-signatories are jointly and severally liable. *See Kramer v. Miller*, 1995 WL 699794 (S.D.N.Y. Nov. 24, 1995). They argue that the case raises the possibility that the language of the agreement assigns responsibility with sufficient specificity between Pulte Diversified Companies, Inc. and First Heights Bank to override the joint liability presumption, and that, as a result, it is reasonable to infer that joint and several liability was not intended. Thus, the Pulte Group argues that summary judgment should not have been granted. We have not addressed this issue directly before and we see no reason for diverging from the standard rule that co-signatories are jointly and severally liable in this case.

In contrast, the FDIC claims that the entirety of the agreement confirms, rather than limits, Pulte Diversified Companies, Inc.'s liability. We agree. The FDIC argues that section 2(b)(1)(B) indicates that the transaction involved other agreements executed by either First Heights Bank or Pulte Diversified Companies, Inc. Thus, under that section, the agreement binds Pulte Diversified Companies, Inc. or First Heights, as the case may be, depending on who signed those

immediately before the two transactions occurred, and the dilution that was caused by the transactions.

## VI.

The Pulte Group also claims that the district court erred in finding that Pulte Diversified Companies, Inc. and First Heights were jointly and severally liable under the terms of the Assistance Agreement. The district court concluded that Pulte Diversified Companies, Inc. was liable under the agreement because: (1) Pulte Diversified Companies, Inc. signed the agreement, and (2) nothing in the agreement limited Pulte Diversified Companies, Inc.'s liability. It is clear that Pulte Diversified Companies, Inc. signed the agreement, and, under Texas law, co-signing an agreement raises a presumption of joint and several liability. *See Pitman v. Lightfoot*, 937 S.W.2d 496, 528 (Tex. Ct. App. 1996) ("In the law of contracts, joint and several liability usually arises when two or more promisors in the same contract promise the same or different performance to the same promisee.") (citing *Restatement (Second) of Contracts* §§ 288, 289 (1981)); *Marynick v. Bockelmann*, 773 S.W.2d 665, 668 (Tex. Ct. App. 1989) ("[G]enerally, joint and several liability arises when two or more persons cosign a contract.") (*rev'd on other grounds*, 788 S.W.2d 569 (Tex. 1990)). This presumption can be refuted by language in the agreement specifically limiting a party's liability, but "'[t]he inference of a joint obligation is not defeated by the fact that it appears either in the terms of the contract or from the circumstances of the transaction, that each promisor is to contribute separately to the entire result for which they bargain.'" 4 *Corbin on Contracts* § 928, at 716 n.30 (quoting *Alpaugh v. Wood*, 23 A. 261 (N.J. 1891)); 2 *Williston on Contracts* § 316, at 543.

The Pulte Group also points to section 29 as evidence that it should not be bound by those sections that do not concern Pulte Diversified Companies, Inc. directly. Section 29 provides:

> All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and

deducted, credited or excluded in any taxable year, but without adjustment to the bad debt reserve, (ii) if the Tax Detriment Items . . . had not been included in income tax in any taxable year and (iii) if any Credits . . . which were included in taxable income for such taxable year . . . were not so included, over

(2) the Federal income tax liability for such taxable year . . . actually incurred by the ACQUIRER and the ACQUIRING ASSOCIATIONS, or the Consolidated Group.

### A.  Covered Asset Losses

The FDIC asserts that the Pulte Group failed to comply with the Assistance Agreement because they have not shared tax benefits received from covered asset losses as required under section 9. The Pulte Group does not dispute that covered asset losses are tax benefit items under section 9(a)(3). Rather, the Pulte Group claims that the majority of tax savings associated with covered asset losses are not to be shared with the FDIC. The Pulte Group emphasizes one clause in section 9(d)(1), "but without adjustment to the bad debt reserve," arguing that it excludes from the tax benefit sharing items any tax benefits associated with covered asset losses based on an adjustment to the bad debt reserve. The district court held, and we agree, that section 9(d) read together with section 9(a)(3) unambiguously requires the Pulte Group to share tax savings from covered asset losses that derive from "adjustment to the bad debt reserve."

Tax benefits realized in connection with most covered asset losses involve an adjustment to the bad debt reserve. A bad debt reserve maintains a reserve to absorb anticipated losses such as covered asset losses. When a loss occurs because of a covered asset liquidation, the bad debt reserve may be reduced to recoup the loss. The Internal Revenue Code allows an income tax deduction when a credit is made to the bad debt reserve to restore it to the allowable amount. The FDIC claims that this tax benefit occurs as a result of a FDIC-related transaction and therefore must be shared.

The crux of this case is that the Pulte Group claims that it agreed to assume the bulk of the liabilities associated with the failed savings and loans and to share with the FDIC some of the tax benefits from the acquisition, but not to share benefits deriving from adjustments to the bad debt reserve. According to the Pulte Group, the phrase "without adjustment to bad debt reserve" requires the hypothetical tax to be calculated "without" regard to tax benefits that result from an adjustment to the bad debt reserve. Under such a reading of section 9(d)(1), tax benefits associated with most covered asset losses would not be subject to sharing with the FDIC.

The district court rejected the Pulte Group's argument, finding that such an interpretation would render section 9(a)(3) superfluous. Under section 9, the Pulte Group is required to pay to the FDIC twenty-five percent of whatever tax savings they realize as a result of certain tax deductions and exclusions that are defined as "tax benefit items." Under section 9(a)(3), tax benefit items include "any cost, expense, or loss (i) which is incurred by [First Heights], (ii) for which [the FDIC] has made assistance payments . . . and (iii) which is deductible on [First Heights'] income tax return or *reduces the balance of [First Heights'] bad debt reserve* but only to the extent such reduction would result in a tax deduction on the experience method" (emphasis added). Section 9(a)(3) undisputedly states that tax benefits resulting from a reduction in the bad debt reserve constitute part of the tax savings entitled to the FDIC.

As Texas law requires, the contract must be read in its entirety. *See Coker*, 650 S.W.2d at 393. When section 9 is read in its entirety, the Pulte Group's interpretation of section 9(d)(1) directly contravenes the utility of section 9(a)(3). The Pulte Group's interpretation excludes particular types of tax benefit items that section 9(a)(3) explicitly states are to be shared. Such an interpretation is not reasonable. In order for the document to make sense as a complete contract, section 9(d)(1) must be read with section 9(a)(3). Read together, it is clear that section 9(a) defines the transactions that fall within the meaning of "Net Tax Benefits" and section 9(d) defines

FDIC from risks associated with general business operations. The dilution of the FDIC warrants, however, did not derive from general business operations. Rather, the dilution directly resulted from actions taken by the Pulte Group when it canceled its obligations under the Tax Allocation and Sharing Agreement and the Warrant Assumption Agreement.

The district court awarded damages to the FDIC for the breach of section 18(e) of the Assistance Agreement and for the breach of section 3(b)(6). As discussed above, both breaches arose from the same transactions. The Pulte Group asserts that by awarding damages under 18(e) and 3(b)(6), the district court allowed a double recovery that is impermissible under Texas law. As the Pulte Group points out, Texas law generally prohibits more than one recovery for the same injury. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998). Therefore, a plaintiff may not recover on both alternate grounds of recovery when there is only one injury. A judgment that awards damages on multiple theories of liability, however, does not amount to double recovery if the theories of liability arise from "two separate and distinct injuries, and there has been a separate and distinct finding of damages on both theories of liability." *Borden, Inc. v. Guerra*, 860 S.W.2d 515, 528 (Tex. Ct. App. 1993).

The Pulte Group breached section 3(b)(6) when First Heights issued a constructive dividend without giving the FDIC the required twenty-five percent payment. In addition, it breached section 18(e), not by issuing a dividend that violated 3(b)(6), but by diluting the value of the FDIC warrants through the same transactions. These two injuries were distinct, the first being an immediate injury and the second being an injury to a long-term ownership interest.

Awards under both section 3(b)(6) and 18(e) will not cause double recovery. We remand the section 18(e) damages to the district court to recalculate the award by determining the book value of the warrant obligation on December 31, 1994,

ACQUIRING ASSOCIATIONS' properties or business; (iii) pay any cash or stock dividends on any class of stock or make any other distribution on such stock except as permitted under this Agreement; or *take any other action which would have the effect of diluting the [FDIC] warrants* (emphasis added).

The FDIC contends that when the Pulte Group canceled its obligations to perform under the Tax Allocation and Sharing Agreement and the Warrant Obligation Assumption Agreement, they created an economic detriment to First Heights that reduced the market value of First Heights's common stock and thus resulted in a reduction in the value of the FDIC warrants. The district court agreed. The Pulte Group claims that the district court erred by reading the term "value" into the contract language. They argue that section 18(e) does not prohibit a dilution in the "value" of the warrants, only in the dilution of the ownership interest of the warrants.

The Warrant Agreement specifically gave the FDIC the right to purchase twenty percent of First Heights's common stock, at one cent per share, anytime between September 8, 1998 and September 9, 2003. The Warrant Agreement also allowed the FDIC to request the market value of twenty percent of the common stock of First Heights instead of purchasing the stock. The twenty percent interest was to be measured from all common stock issued and outstanding on the date that the FDIC elected to exercise the warrant options. Section 18(e) does not mention a specific amount of stock, but rather states that the FDIC is entitled to a percentage of all common stock issued and outstanding. The percentage of ownership interest in First Heights that is available under the Warrant Agreement cannot be changed. Thus the anti-dilution provision in section 18(e) must be interpreted to prevent the dilution of the "value" of the FDIC's warrants and not the ownership interest percentage.

As the Pulte Group points out, the market value of stock invariably fluctuates and section 18(e) does not protect the

the method of calculating the amount of those benefits. Viewed in this manner, section 9 is both unambiguous and coherent.

The Pulte Group claims that the district court improperly ignored the testimony of experts when reading the contract. However, under Texas law, "[o]nly where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." *National Union Fire Insurance Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Because the district court correctly found the Assistance Agreement to be unambiguous, it need not have considered any evidence outside of the plain meaning of the contract.

## B. Accrued Interest Expenses

The FDIC also argues that, under section 9(a)(1), accrued interest expenses constitute tax benefit items of which the FDIC is entitled to share in the resulting tax savings. The Pulte Group, however, claims that accrued interest expenses are not a tax benefit item and therefore any savings should not be shared with the FDIC.

Section 9(a)(1) of the Assistance Agreement defines tax benefit items as:

> The amount of any net operating loss carryovers, any capital loss carryovers and any other loss carryovers of an ACQUIRED ASSOCIATION at the Effective Date, resulting in a tax deduction from either ACQUIRING ASSOCIATION's gross income.

Accrued interest expenses, for the purposes of this case, are the interest expenses from the interest payable to depositors that had accrued but had not been paid, and the interest expenses that were paid but had not been deducted. The five failed institutions did not take tax deductions for these accrued interest expenses prior to the acquisition by First

Heights. After the acquisition, the expense deductions became available to First Heights.

The FDIC claims, and the district court concluded, that the term "any other loss carryovers" encompasses accrued interest expenses acquired by First Heights. We disagree. The term "loss carryover" is not precisely defined in the Assistance Agreement. The principal word in this case is "loss," not "carryover." We interpret accrued interest expenses to be interest expenses incurred but not paid or deducted. Interest expenses are costs of doing business rather than losses in the ordinary sense. Because of the omission of precise language defining accrued interest expenses as a "loss carryover," we cannot read into the contract the definition given by the FDIC. Accured interest expenses are not tax benefit items under section 9(a)(1). The FDIC is therefore not entitled to receive any payments as a result of accrued interest expenses.

## C.  Non-Covered Asset Losses

The parties next dispute whether non-covered asset losses constitute tax benefit items to be shared under section 9. Non-covered assets are all tangible assets, such as marketable securities and the mortgage portfolio, that the Pulte Group acquired in the transaction and were not included in the definition of covered assets. The Pulte Group has benefitted from tax deductions from the sales or dispositions of non-covered assets that resulted in a loss. The FDIC claims, and we agree, that tax savings attributable to non-covered assets qualify as shared tax benefit items under section 9(a)(3).

Defining shared tax benefit items for purposes of this case, Section 9(a)(3) states:

> Any cost, expense or loss (i) which is incurred by an ACQUIRING ASSOCIATION (ii) for which the CORPORATION has made assistance payments . . . pursuant to § 3(a) of this Agreement . . ., and (iii) which is deductible on an ACQUIRING ASSOCIATION's Federal or state income tax return . . . .

conferred on the Pulte Group by the removal of the tax sharing liability incurred between 1988 and the end of 1994, as calculated under our interpretation of section 9. The district court must also determine the economic benefit conferred on the Pulte Group by the removal of the warrant obligation liability on December 30, 1994.

The amount of the constructive dividend given by First Heights must be controlled by the well-known rule that dividends cannot exceed retained earnings and profits. In *Hagaman*, 958 F.2d at 694, we stated that "[b]ecause dividends can only be distributed to the extent of a corporation's earnings and profits under IRC § 316, a court can only find a constructive dividend to be taxable as ordinary income to the extent of the corporation's earnings and profits." Another opinion recognizes that "[o]therwise, a distribution to the stockholder is merely a recovery from his basis in his shares to the extent that he has such a basis; to the extent that the payments exceed the basis, the payments amount to a [taxable capital] gain." *Estate of DeNiro v. Commissioner*, 746 F.2d 327, 332 (6th Cir. 1984). Although this is not a tax case, the same limitations on constructive dividends should apply. If the district court determines that the economic benefit to the Pulte Group from the 1994 transactions exceeds the First Heights's retained earnings and profits immediately prior to the two transactions, then the constructive dividend and payments under section 3(b)(6) must be limited.

## V.

The FDIC argues that the Pulte Group also violated section 18(e) of the agreement which prohibits the Pulte Group from taking actions that dilute the warrants. Section 18(e) states:

> Except as the CORPORATION shall otherwise consent in writing and except as otherwise specifically authorized in this Agreement or in the Warrant Agreement, the ACQUIRER and ACQUIRING ASSOCIATIONS shall not . . . (ii) authorize the sale, lease or conveyance . . . of all or substantially all of the

expectation of reimbursement, that economic benefit becomes a constructive dividend, taxable to the respective shareholder.

(quoting *Loftin & Woodard, Inc. v. United States*, 577 F.2d 1206, 1214 (5th Cir. 1978)).

The test is then whether First Heights conferred an economic benefit for which it did not expect reimbursement. *See id.* If the two 1994 transactions have the economic effect of dividends, even if not explicitly designated as such, they may still be characterized as constructive dividends and thus be subject to sharing with the FDIC under section 3(b)(6).

First Heights and the Pulte Group completed the 1994 transactions without giving any notice to the FDIC that First Heights was assuming these liabilities. When First Heights and the Pulte Group canceled the Pulte Group's contractual duty to fund First Heights' tax benefit sharing obligations to the FDIC, the Pulte Group was able to remove an accrued tax sharing liability from its books. The removal of this liability had a positive economic effect for the Pulte Group. First Heights did not expect any reimbursement as a result of the contract's rescission. Although the Pulte Group and First Heights operated in a combined (and perhaps informal) accounting manner, the fact remains that the Pulte Group, in its capacity as the sole shareholder of First Heights, received an economic benefit when it removed the tax sharing liability from its corporate ledgers. Likewise, when First Heights and the Pulte Group rescinded the Warrant Obligation, the Pulte Group was able to remove a liability from its books and, thereby, receive an economic benefit. We agree with the district court that any economic benefits conferred by First Heights as a result of these transactions are constructive dividends covered by section 3(b)(6).

In light of the incompleteness of the record concerning the amount of economic benefit conferred by First Heights to the Pulte Group, we find it best to remand the damages issue for the district court to calculate the proper damages amount. The district court must determine the economic benefit

Accordingly, Section 9(a)(3) has three requirements: that there be a loss attributable to non-covered asset losses; that the Pulte Group has taken a tax deduction for the non-covered asset losses; and that the FDIC made assistance payments to compensate First Heights for losses on non-covered assets. The Pulte Group does not challenge that section 9(a)(3)'s first two requirements, that they have incurred losses attributable to non-covered asset losses and that they have taken deductions for those losses, are met. Rather, they challenge the FDIC's claim that payments pursuant to section 3(a) satisfy the third requirement of section 9(a)(3).

The FDIC points to section 3(a)(12) to show that it made the required payments. Section 3(a)(12) provided payments for:

The allocable expense for the amortization of the amount of goodwill . . . that is attributable to the acquisition pursuant to the Acquisition Agreements of loans that do not constitute Covered Assets under this Agreement and Marketable Securities to the extent such goodwill arises from the fact that such loans or Marketable Securities bear interest at a rate below market rates at the Effective Date.

The Pulte Group does not dispute that the FDIC made the requisite payments to First Heights under section 3(a)(12) and that those payments reimbursed First Heights for the difference between the contractual rate of interest on non-covered assets and the lower market rate of interest as of the date of acquisition. The Pulte Group claims, however, that the payments received under section 3(a)(12) were not "assistance payments" related to non-covered assets because the FDIC did not reimburse First Heights for the actual losses incurred at the time First Heights disposed of them. The Pulte Group contends that the goodwill payments they received pursuant to section 3(a)(12) and the loan losses they incurred on the disposition of non-covered assets are separate and distinct concepts.

The district court found that the Assistance Agreement did not require that the FDIC reimburse First Heights for the actual amount of the losses at the precise time they were incurred in order for the reimbursement to constitute an assistance payment. Because the FDIC did make payments under section 3(a)(12) to First Heights to compensate for the loss on the non-covered assets, the FDIC did make assistance payments pursuant to the Assistance Agreement. Returning to the original three requirements of section 9(a)(3), we conclude that all are met and the Pulte Group must therefore share the tax benefits obtained from the non-covered asset losses.

### D.  Damages

The district court awarded $62,544,509 in damages under section 9 for the tax years between 1988 and 1996. The Pulte Group asserts that a genuine issue of material fact exists as to the amount of damages due to the FDIC. Although the district court ordered a damages award without providing any explanation of its calculations, the record below contains sufficient information to conclude that the parties disagree about only $6,096,233 of the tax benefits award. Having reviewed the record, we conclude that the district court correctly granted summary judgment on the issue of damages. No genuine issue of material fact exists as to the amount of damages. In light of our finding that acquired interest expenses are not tax benefits subject to First Heights's sharing obligation, we remand these damages for the district court to recalculate the section 9 award for 1988-1996 accordingly.

The district court also awarded "at least $32,930,035 " to the FDIC as its share of the tax benefits for the tax years after 1996. At this point, First Heights has filed its tax returns for 1997 and 1998 and the tax benefit sharing payments for those years have come due. Any payments due for tax benefits arising in 1999 will not become due to the FDIC until later this year (2000). Because the 1997 and 1998 tax filings allow for the amounts due to the FDIC to be determined with certainty, the district court's speculative calculation now

seems unnecessary. We hereby vacate the $32,930,035 award and remand for the district court to enter an award for the full amount due under section 9 for the 1997 and 1998 tax years.

### IV.

The FDIC and the Pulte Group next dispute whether First Heights issued a constructive dividend to the Pulte Group. Under Section 3(b)(6) of the Assistance Agreement, First Heights must pay the FDIC the equivalent of twenty-five percent of the "total amount of any dividends declared by [First Heights] on its issued and outstanding common stock . . . owned by any shareholder, director, affiliate or controlling person of any party hereto." The district court found that the amendment to the Tax Allocation and Sharing Agreement and the rescission of the Warrant Obligation Assumption Agreement conferred constructive dividends on the Pulte Group within the meaning of section 3(b)(6). We agree with the district court's finding that the two transactions produced constructive dividends; the district court, however, erred in computing the amount of the economic benefit that First Heights conferred on the Pulte Group.

The Assistance Agreement does not define the term "dividend." The Pulte Group argues that section 3(b)(6) is limited to "declared" dividends and thus the 1994 transactions do not constitute dividends because First Heights never formally declared any dividend. This argument ignores the rule that dividends can occur in the absence of a declaration. In *Ramo, Inc. v. English*, 500 S.W. 2d 461, 465 (Tex. 1973), the Texas Supreme Court stated that "[a] distribution of money or property by a corporation to its shareholders may constitute a dividend in law even though not formally designated as such by the board of directors." Our jurisprudence has recognized constructive dividends, or dividends in law, in cases involving the Internal Revenue Service. In *Hagaman v. Commissioner of Internal Revenue,* 958 F.2d 684, 690 (6th Cir. 1992), we acknowledged that

> [w]hen a corporation confers an economic benefit upon a shareholder, in his capacity as such, without an