**EXXON MOBIL CORPORATION,**
Plaintiff–Appellant/Cross–
Appellee,

v.

**Paul J. FENELON and Ronald M. Sohr, Defendants–Appellees/Cross–Appellants.**

Nos. 01–6254, 01–6255.

United States Court of Appeals,
Sixth Circuit.

July 30, 2003.

Before CLAY and GIBBONS, Circuit Judges; and CLELAND,* District Judge.

OPINION

CLELAND, District Judge.

This case arose out of the sale of ComAlloy International Corporation ("ComAlloy"), which Defendants/Appellees/Cross–Appellants Paul J. Fenelon and Ronald M. Sohr sold to Plaintiff/Appellant/Cross–Appellee Exxon Mobil Corporation ("Exxon"). Plaintiff purchased ComAlloy in two stages. First, in December of 1986, Exxon acquired a minority interest (19%) of ComAlloy plus an option to purchase the remainder of ComAlloy's stock within five years. Thereafter, Exxon exercised that option by purchasing the remainder of ComAlloy's stock in February of 1991.

Exxon brought suit against Defendants in January of 1993, asserting various claims related to both stages of the acqui-

sition.[1] The jury found against Exxon on its claims and for Defendants on their counterclaims. Exxon thereafter filed a motion for judgment as a matter of law, arguing, as one of its issues, that it was entitled to judgment notwithstanding the jury's verdict on its claim for breach of express warranty. The district court denied the motion, finding that Exxon had not even brought a claim for breach of express warranty. While there are many issues presented on appeal, the central argument that Exxon makes is that the district court erred in (1) finding that Exxon had not brought a claim for breach of express warranty and (2) not awarding Exxon judgment as a matter of law on that claim. Specifically, Exxon's main argument is that Defendants had expressly warranted in a 1986 contractual agreement that they had "in all material respects, complied with all laws." Exxon argues that, as a matter of law, Defendants had breached this warranty because prior to 1986 they were not in compliance with three federal laws relating, in general, to making false statements to a government agency. Both parties also appeal the issue of prejudgment interest. For the reasons stated below, we AFFIRM IN PART, VACATE IN PART, and REMAND for the limited purpose of recalculating prejudgment interest.

## I. FACTUAL BACKGROUND

On December 11, 1986, Exxon entered into an agreement with Defendants Ronald M. Sohr and Dr. Paul J. Fenelon to purchase 19% of the stock of ComAlloy, the business Defendants had begun in 1981. Section 4.14 of the "Plan and Agreement of Acquisition" (the "1986 Agreement"), pro-

---

* The Hon. Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The action was actually initiated by Exxon and ComAlloy. ComAlloy does not appeal any issue of the district court's decision.

vided that "ComAlloy has, in all material respects, complied with all laws, regulations and orders applicable to its business and has all material permits and licenses required thereby." Section 4.14 is the only portion of the 1986 Agreement at issue on appeal.

ComAlloy was a plastics compounding business. As such, ComAlloy mixed plastic polymers with a variety of materials to create pellets of compounded plastic parts. ComAlloy supplied these pellets to "molders," who processed them in numerous applications, which ranged from electric drill housings, car dashboards, and military equipment. The "molders" in turn sold the finished product to end users. Dr. Fenelon typically knew the end user and end use of the pellets because that information was important in determining the appropriate formulation.

Some of ComAlloy's molder customers and their end users required ComAlloy to provide "certifications" that ComAlloy products met certain physical, mechanical, and electrical properties set forth in the customer's product specifications. "General" certifications certified that a particular product met the requirements for specified properties that were set forth in the product specification. "Specific" certifications certified that a particular shipment, or lot, of product had been tested in accordance with the requirements set forth in the particular specification. Specific certifications purported to contain "actual" test

results that had been obtained from samples from a given lot.

Exxon's brief discusses in detail the process by which Dr. Fenelon would create and certify a customized shipment for the use of a particular customer. A recitation of the intricate details of this process is not necessary for the resolution of this appeal. In sum, Dr. Fenelon admitted that he did not actually run all of the tests reported on the certifications. (For some of the tests, such as those involving dielectric strength and dielectric constant, ComAlloy did not even have the equipment necessary to run the tests.) Instead, for some of these certifications, Dr. Fenelon would derive or calculate the necessary value based on his knowledge and research of the materials and their relationship to one another. This derived value would be included in the certification as though it had been reached, not through calculation, but through an actual test.[2]

Because the only laws which Exxon now contends Defendants violated involve false statements and claims made to the United States government, the only certifications relevant to the court's inquiry involve military specifications. Products certified to military specifications accounted for approximately 0.5 percent of ComAlloy's sales. While Dr. Fenelon was asked generally about his certification techniques, only one military certification dated prior to December 11, 1986, was introduced into evidence.[3] This particular certification,

2. The specifics of the method through which the certification had been reached are not at issue. As will be discussed below, the important issue on appeal is whether this process of certifying the calculated values as actual test results breached § 4.14 of the 1986 Agreement.

3. Exxon introduced a list of approximately 150 ComAlloy certifications related to military specifications. Most of the certifications on the list, however, were dated after the

1986 Agreement was signed and thus are not relevant to the court's inquiry. Because the 1986 Agreement warranted only that Defendants had complied with all laws, the warranty only covers behavior prior to the signing of the agreement. In other words, the 1986 Agreement did not warrant that Defendants would comply with the laws in the future. Moreover, the actual certifications referenced in the list were not introduced into evidence,

the "Regal Plastics" certification, called for a total of seven tests. Dr. Fenelon testified that all the properties other than those related to dielectric properties were capable of being tested at ComAlloy, and that it was his practice to test those properties. As for the dielectric properties, Dr. Fenelon testified that he extrapolated the dielectric values based upon his research and a formula that he derived for determining the dielectric value from the other known values. Thus, according to Dr. Fenelon's testimony, five of the seven values were actually tested, and two were extrapolated. Dr. Fenelon also testified that he knew that the Regal material was not to be used in an electrical application. Further, he testified that he knew that the only things which were "critical" about the Regal material were the dimensions of the part and the rigidity of the part.

Exxon goes to great lengths in its briefs to illustrate how the certification process of Dr. Fenelon was unethical or against industry standards. The salient issue on appeal, however, is whether, in light of the certification practice, Defendants were in breach of § 4.14 of the 1986 Agreement. That is, whether as of December 11, 1986, Defendants "ha[d], in all material respects, complied with all laws, regulations and orders applicable to its business and has all material permits and licenses required thereby."

## II. PROCEDURAL HISTORY

Exxon initiated its action on January 29, 1993. On July 14, 1995, the parties filed a joint motion, requesting that the court remove "this case from the active docket pending resolution of a collateral investiga-

tion disclosed at the conference conducted in chambers on July 13, 1995, to be returned to the active docket on motion of any party, for good cause shown." This motion was granted, and the case remained on the inactive docket until November 7, 1997. A Second Amended Complaint was filed on March 27, 1998.

The case proceeded to trial from February 13, 2001 through March 9, 2001. The jury found for Defendants on Exxon's claims and for Defendants on their counterclaims. The district court entered a judgment in accordance with the jury's verdict on March 30, 2001, awarding each Defendant $825,000 against Exxon. Exxon filed a motion for judgment as a matter of law or for a new trial. The district court denied that motion on August 14, 2001. Exxon's timely appeal followed.

## III. DISCUSSION

### A. Whether Exxon Asserted a Breach of Express Warranty Claim

The first issue Exxon presents for appeal is whether the district court erred in its post-trial order in finding that Exxon had not brought a claim for breach of express warranty against Defendants.[4] After the jury returned its verdict, Exxon brought a motion for judgment as a matter of law, arguing among other things that Exxon was entitled to judgment on its claim for breach of express warranty. The district court denied the motion, finding in part that Exxon had not brought a separate breach of express warranty claim, but had brought only a breach of contract claim. While we are inclined to uphold the district court, we need not reach this issue.

---

and thus there is no basis to review the representations made.

**4.** The Court reviews *de novo* the district court's conclusion that Exxon had not

brought a claim for breach of express warranty. *See, generally, Sharpe v. Cureton*, 319 F.3d 259, 265–66 (6th Cir.2003).

Count 5 of Exxon's Second Amended Complaint was entitled "Breach of Initial Acquisition Agreements." Under that count, Exxon alleged that "[t]he Improper Practices and the foregoing actions and omissions of Sohr and Fenelon relating to the Improper Practices constitute breaches of representations, warranties, covenants and agreements of Fenelon and Sohr in each of the Initial Acquisition Agreements." The issue before the court is whether this statement asserted separate causes of action for both breach of contract and breach of express warranty, or whether it merely asserted a breach of contract based on various provisions of the 1986 Agreement, one being the warranty found in § 4.14. Exxon argues that a separate claim for breach of express warranty was asserted and presented to the jury, while Defendants argue that any such claim was subsumed under Exxon's breach of contract claim. The record below is admittedly unclear.

Exxon argues that under the liberal pleading rules of federal law, the averment found in Count 5 adequately asserted an action for both breach of contract and breach of express warranty. Exxon contends that this averment satisfies Federal Rule of Civil Procedure 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Exxon also relies on the Pretrial Order, which on the first page stated that "[a]ll pleadings are amended to conform to the Pretrial Order. The Pretrial Order supplants the pleadings." The Pretrial Order contains a summary of all the claims and counterclaims being asserted. Under Exxon's first claim, the order stated that "Exxon asserts that the Defendants breached the following provisions of the 1986 Acquisition Agreement ..." Thereafter followed eight alleged breaches (labeled a-h), one of which referenced § 4.14,

with an explanatory parenthetical stating "representation that ComAlloy has in all respects complied with all applicable laws." Further the Pretrial Order contained various legal issues that Defendants raised; among them was an issue related to Plaintiffs' "claims for breach of representations and warranties." Thus, Exxon contends that Defendants had notice that Exxon was asserting both a breach of contract claim and a breach of warranty claim.

Defendants disagree, arguing that Exxon's claim was for breach of contract based, in part, upon certain representations and warranties. Defendants point to Exxon's "Objections to Defendants' Proposed Jury Instructions," in which Exxon stated,

> The representations and warranties at issue in this case are contained in contracts between the parties, and the failure by Defendants to honor those representations and warranties are being raised by Plaintiffs through a breach of contract claim. *The elements that would apply to a 'breach of express warranty' claim (e.g., reliance) therefore do not apply.*

(Emphasis added.)

Exxon further argues that, regardless of the state of the pretrial documents, a claim for breach of express warranty was tried and charged to the jury. Under Federal Rule of Civil Procedure 15(b), "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings." Fed.R.Civ.P. 15(b). Exxon relies on a "Memorandum" which the district court issued after opening statements, on February 13, 2001. The Memorandum was issued to "assist the parties in preparing and structuring the presentation of their cases." Exxon cites Section IV of the

"Memorandum," entitled "Breach of Warranties/Representations." This section presents two issues: "(1) do these claims contain an element of reliance? and (2) is the lack of due diligence a defense to these claims." Exxon therefore argues that the "Memorandum" evinces that breach of warranty was a separate claim from breach of contract.

While § IV of the "Memorandum" refers to certain representations and warranties in a *general* sense, § I of the "Memorandum," labeled "Plaintiffs' Breach of Contract Claims," *specifically* refers to § 4.14, stating that "[o]ne of the plaintiff's arguments for the breach of the contract claims is that the defendants breached the contract provisions representing that they were in compliance with all laws, sections 4.14 and 16 of the Acquisition Agreement." Thus, contrary to Exxon's argument, the "Memorandum" issued after opening statements had been delivered lends further support that the breach of § 4.14 was incorporated into the breach of contract claim.

In any event, this dispute ultimately comes down to how the jury was charged. Both parties agree that Exxon did not object to the jury instructions, and both parties contend that the jury instructions support their respective arguments. Related to the § 4.14, the jury verdict form contained only a section entitled "Breach of 1986 Acquisition Agreement," with a yes or no finding required as to whether "Exxon ha[d] proved, by a preponderance of the evidence, each of the elements of its claim against [Mr. Sohr and Dr. Fenelon] for breach of the 1986 Acquisition Agree-

ment."[5] To this question, the jury responded "no." Because Exxon claims no error with the jury instructions or verdict form, even if we were to find that Exxon had in fact asserted a breach of express warranty claim, we would still need to address Exxon's second claim of error. Accordingly, we need not decide the issue of whether the court erred in finding that a breach of express warranty claim was not asserted.

**B. Whether Exxon Would Be Entitled to Judgment as a Matter of Law on Any Claim for Breach of Express Warranty**[6]

### 1. Standard of Review

"A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n,* 174 F.3d 733, 741 (6th Cir.1999) (citing *Menuskin v. Williams,* 145 F.3d 755, 761 (6th Cir. 1998)). In diversity cases, the Sixth Circuit "adheres to the minority rule that state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict." *Id.* (quoting *J.C. Wyckoff & Assoc., Inc., v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1483 (6th Cir.1991)).

Texas law, which governs the instant issue, provides that in reviewing motions for judgment notwithstanding the verdict,

> The party with the burden of proof who challenges the legal sufficiency to sup-

---

5. Notably, the verdict form used the singular form of "claim," suggesting there was only one claim related to a breach of the 1986 Agreement.

6. Exxon concedes that the issue of materiality, which is required under a breach of con-

tract claim but not under a breach of warranty claim, is a factual issue not susceptible to appellate review. Thus, on appeal, Exxon argues only that it is entitled to judgment as a matter of law on a breach of warranty claim, but not on a breach of contract claim.

port the jury's failure to find must surmount two hurdles. The party must show that no evidence supports the failure to find and that the evidence establishes the desired finding as a matter of law. First, we review the evidence in the light most favorable to the jury finding, indulging every reasonable inference in favor of the finding. If there is more than a scintilla of competent evidence to support the jury finding, we will affirm the finding. Evidence amounts to more than a scintilla if it supplies a reasonable basis for reasonable minds to reach differing conclusions as to the existence of the crucial fact. If there is no evidence to support the finding, then an examination of the entire record must demonstrate that the contrary proposition is established as a matter of law. If the proposition asserted by the appellant is established as a matter of law, the point of error will be sustained.

*Lesikar v. Rappeport,* 33 S.W.3d 282, 300 (Tex.Ct.App.2000) (internal citations omitted).

### 2. Analysis [7]

The district court correctly charged the jury that, in order to prove a claim for breach of express warranty, Exxon was required to prove by a preponderance of the evidence,

One, the defendants made a representation of fact or an express warranty;

Two, this representation or warranty became a part of the agreement between the parties;

Three, the plaintiff Exxon relied upon this representation or warranty;

Four, [one] or both of defendants breached this representation or warranty;

Five, the plaintiff Exxon was injured by this breach;

And, six, the breach of the representation or warranty by one or both of the defendants was the proximate cause of Exxon's injury.

*See Great American Products v. Permabond Internat'l,* 94 S.W.3d 675, 681 (Tex. Ct.App.2002). Exxon argues that inasmuch as breach of warranty, unlike breach of contract, requires materiality as an element of its claim, and because materiality is the only basis on which the district court concluded a jury question existed, Exxon is entitled to judgment as a matter of law on its breach of express warranty claim.[8] Defendants argue that, regardless of the fact that materiality is not an element of a breach of warranty claim, the warranty at issue on appeal contains materiality as part of the contract term. Specifically, § 4.14 of the "1986 Agreement", provides that "ComAlloy has, *in all material respects,* complied with all laws, regulations and orders applicable to its business and has all material permits and licenses required thereby." (Emphasis added.) Defendants thus contend that regardless of whether Exxon's claim was for breach of contract or breach of express warranty, Exxon had to prove the issue of materiali-

---

**7.** Exxon suggests that if we find that it did indeed assert a claim for breach of express warranty, then we should automatically find that Exxon is entitled to judgment as a matter of law on this claim, because the district court "apparently was of the view that the evidence demonstrated that ComAlloy breached the representation." We disagree. The district

court decided the motion for judgment as a matter of law solely on the issue of materiality, and expressly did not reach any other issues related to this alleged breach.

**8.** As stated above, we assume for the sake of this issue that Exxon did indeed assert a claim for breach of express warranty.

ty.[9] Thus, because Exxon admits that the issue of materiality was a jury question, Defendants contend that Exxon is not entitled to judgment as a matter of law on this issue.

Exxon disagrees, arguing that the contract phrase "in all material respects" has a different meaning than does the element of materiality in breach of contract claims. Exxon argues that "the plain meaning of the 'all material respects' language is that ComAlloy had complied with all laws, regulations, and orders the violation of which could have a material effect on ComAlloy's business." We find that the contract term in question is susceptible of the meanings advanced by both parties.

First, as Defendants assert, "in all material respects" could mean that Defendants had complied with all applicable laws such that Exxon was "receiving substantially what it bargained for under the contract." Conversely, the phrase could mean, as Exxon argues, that Defendants complied with all the applicable laws which were material to the business of ComAlloy. Under Texas law, "[A] contract is ambiguous if the language used is susceptible of more than one meaning [and] ... [t]he interpretation of an ambiguous contract is a question of fact." *Thompson v. CPN Partners*, 23 S.W.3d 64, 71 (Tex.Ct.App. 2000). Thus, where "in all material respects" is susceptible of the interpretation advanced by both parties, the issue became a factual question, properly left within the province of the jury. Inasmuch as the jury returned a verdict against Exxon, we will not overturn that decision unless no more than a scintilla of evidence supports its decision. *See Lesikar*, 33 S.W.3d at 300. We find that more than a scintilla of evidence exists that "in all material respects" required Exxon to prove materiality, and further, that more than a scintilla of evidence exists that Exxon received substantially what it bargained for in the 1986 contract.[10]

Moreover, even if the meaning advanced by Exxon were accepted, more than a scintilla of evidence exists supporting the jury's verdict that this provision was not breached. Exxon asserts that Dr. Fenelon's practices of extrapolating certain numbers for certification instead of actually performing the tests to derive the numbers violated three laws: the Civil False Claims Act, 31 U.S.C. § 3729, the Criminal False Claims Statute, 18 U.S.C. § 287, and the Criminal False Statements Statute, 18 U.S.C. § 1001.[11] All three of these laws require that the false statement or claim at issue be presented to an agent of the United States government, paid with United States' funds, or fall within the jurisdiction of the United States.

Even assuming that Exxon had conclusively proved that Defendants had violated one of the laws at issue through its practices related to certification techniques to the United States Military, this does not mean *ipso facto* that no evidence exists to support the jury's finding that Defendants had not breached § 4.14. More than a scin-

---

**9.** The district court instructed the jury that "[a] breach is material if the failure of one party to perform some obligation under the contract results in the other party not receiving substantially what it bargained for under the contract."

**10.** As noted above, Exxon does not dispute that the issue of materiality created a jury question, nor does Exxon take issue with the district court's findings related to materiality set forth in its order denying the motion for judgment as a matter of law.

**11.** At trial, Exxon argued that Defendants' certification process also violated the Mail Fraud and Wire Fraud Statutes, 18 U.S.C. §§ 1341 & 1343, but does not raise these issues on appeal.

tilla of evidence exists to support the finding that Defendants were in compliance *in all material respects* with the applicable laws. As the district court pointed out in its order, and as Defendants assert, there was no evidence presented of any legal action, criminal or civil, taken against ComAlloy or Exxon. Further, the court correctly pointed out that after Exxon "voluntarily disclose[d] the prior certification practices to the Department of Defense, the government chose not to take any action against Exxon or ComAlloy." Based on these facts alone, the jury could conclude that Defendants had complied "in all material respects" with all applicable laws. This is not to say, as Exxon argues, that Defendants' position is nothing more than an argument that a mere "technical" violation of a law is not a material violation of the law. Nonetheless, given that no criminal action was taken against ComAlloy based upon the actions of which Exxon complains, a reasonable jury could conclude that Defendants had complied with the laws which were material to the business of ComAlloy.

Indeed, Exxon produced only one military specification which it specifically alleges violates the three relevant laws. Based upon this one certification (and admittedly on the testimony of Dr. Fenelon's general practices with respect to all certifications) Exxon submits as a matter of law that Defendants were not in compliance with all applicable laws in all material respects. Contrary to Exxon's assertion, the Regal Plastics certification does not conclusively establish that Defendants were in noncompliance in all material respects with any of the three laws. While Dr. Fenelon admitted two of the seven values had been extrapolated, he also gave testimony indicating that the other five had been actually tested. Moreover, while there was testimony that Regal Plastics required that all the properties be certified as actually test-

ed, and that the military required such testing, the final certification signed by Dr. Fenelon indicated only that "[t]he above material is hereby certified to have the properties listed below when dried and molded under standard/recommended conditions. These properties meet or exceed Military Specification MIL–P–81390." Thus, while it might not be a defense to the actual laws at issue that what Dr. Fenelon certified may be technically correct, a reasonable jury could find that any noncompliance of the laws was not "material" under § 4.14.

Based on all of the foregoing, we conclude that more than a scintilla of evidence existed to support the jury's finding that Defendants did not breach the express warranty in § 4.14 of the 1986 Agreement, and we therefore affirm the district court's denial of the motion for judgment as a matter of law.

C. Whether Exxon is Entitled to Judgment as a Matter of Law on Defendants' Counterclaims for Breach of Their Respective Restrictive Agreements

Because one of the elements of Defendants' counterclaims was that they had performed their obligations under the 1986 Agreement, the parties agree that this issue rises or falls with Exxon's second issue. Thus, because we affirm the district court's conclusion that Exxon is not entitled to judgment as a matter of law on its claim for breach of express warranty, we likewise affirm the district court's judgment upholding the jury verdict on this issue as well.

D. Whether Exxon is Entitled to a New Trial

1. Standard of Review

As stated above, "[a] federal court exercising supplemental jurisdiction over state

law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n,* 174 F.3d 733, 741 (6th Cir.1999) (citing *Menuskin v. Williams,* 145 F.3d 755, 761 (6th Cir.1998)). Under diversity jurisdiction, the court follows the federal standard in reviewing the denial of a motion for new trial. *Anchor v. O'Toole,* 94 F.3d 1014, 1021 (6th Cir.1996) (*citing Arms v. State Farm Fire & Casualty Co.,* 731 F.2d 1245, 1248–49 (6th Cir.1984)). The district court's denial of a motion for a new trial is reviewed for an abuse of discretion. *Id.* (citing *Gafford v. General Elec. Co.,* 997 F.2d 150, 171 (6th Cir.1993)). Ordinarily there is no abuse of discretion unless the panel has "a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (citations omitted). "In reviewing a trial court's denial of a new trial motion on the ground that the verdict is against the clear weight of the evidence, ... the jury's verdict [is accepted] if it was reasonably reached." *Id.* (citing *Portage II v. Bryant Petroleum Corp.,* 899 F.2d 1514, 1523 (6th Cir.1990)). The Sixth Circuit has held that when reviewing the denial of a new trial, an abuse of discretion is defined as "a definite and firm conviction that the trial court committed a clear error of judgment." *Tobin v. Astra Pharm. Prod.,* 993 F.2d 528, 541 (6th Cir.1993).

### 2. Analysis

We affirm the district court's denial of a new trial. For all the reasons stated in Section II, above, a reasonable jury could find that Defendants were not in breach of § 4.14 of the 1986 Agreement. The evidence upon which a reasonable jury could have, and indeed did, so find includes, but is not limited to: testimony that no criminal or civil actions had been brought against ComAlloy for the challenged actions; testimony that military specifications accounted for only .5% of ComAlloy's total sales; the fact that Exxon introduced only one military certification, the Regal Plastics certification, in the relevant time period; and Dr. Fenelon's testimony indicating that five of the seven tests had actually been performed in the Regal Plastics certification. Finally, and most importantly, the jury could have found that "material" as used in § 4.14 of the 1986 Agreement had the same meaning as "material" as used in a "material breach," on which issue Exxon concedes a jury question existed. In light of this abundant evidence supporting the jury verdict, and the conclusions drawn therefrom, we find that the district court did not abuse its discretion in refusing to set aside the jury verdict.

### E. Whether the District Court Erred in Refusing to Toll the Accrual of Prejudgment Interest During the Period that the Parties Agreed to Place the Case on the Inactive Docket

#### 1. Standard of Review

The decision of whether to grant prejudgment interest is reviewed for abuse of discretion. *Clay v. Ford Motor Co.,* 215 F.3d 663, 672 (6th Cir.2000). Nonetheless, Exxon does not challenge the decision to award prejudgment interest, but rather appeals from the district court's legal decision not to toll the prejudgment interest during the time that Exxon contends the parties had entered into a "standstill agreement." Accordingly, the court reviews the district court's legal conclusion *de novo.* *Piazza v. City of Granger,* 909 S.W.2d 529, 532 (Tex.Ct.App.1995) ("An appellate court reviews trial court conclusions of law *de novo* as legal questions.").[12]

12. In diversity cases, state law governs awards of prejudgment interest. *See FDIC v.*

### 2. Analysis

Texas courts generally hold that "an agreement between the parties to temporarily suspend all aspects of a lawsuit may operate to toll the accrual of prejudgment interest." *Ellis v. City of Dallas,* 111 S.W.3d 161, 163 (Tex.Ct.App. 2003). Such agreements are called "standstill agreements" and typically constitute agreements "to maintain the status quo and temporarily suspend or stop a suit." *Brookshire Grocery Co. v. Smith,* 99 S.W.3d 819, 821 (Tex.Ct.App. 2003).

Exxon argues that from June 6, 1993, the date upon which Plaintiffs filed their first Amended Complaint until November 7, 1997, the proceedings in this case were stayed by agreement of the parties. Exxon points to the absence of entries on the docket sheet as evidence of this agreement, and further argues that a joint motion filed on July 14, 1995 memorialized this agreement in writing. The Joint Motion stated simply,

> The parties jointly move for an order removing this case from the active docket pending resolution of a collateral investigation disclosed at the conference conducted in chambers on July 13, 1995, to be returned to the active docket on motion of any party, for good cause shown.

This motion was granted without further elucidation of any agreement between the parties regarding the status of the parties' rights while the case remained on the inactive docket. The case was placed back on the active docket, after Defendants' motion, on November 7, 1997.

In an opinion dated August 21, 2001, the district court found that no standstill agreement between the parties existed during this period. According to the district court, and neither party suggests that

this finding was in error, "the parties informally agreed to suspend formal discovery and further action on the case while there was a possibility of criminal investigations into the operations of ComAlloy ..., which were the subject matter of the lawsuit." The court further found that "[t]he defendants claim that they did some work on the case during this period, but they do not claim that any formal discovery was taken."

Exxon relies on *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.* 962 S.W.2d 507 (Tex.1998), for the proposition that the default rule is that, unless they provide otherwise, standstill agreements toll the accrual of prejudgment interest. Nonetheless, as the district court held, this rule presupposes the existence of a standstill agreement in the first place. In this case, Defendants have vigorously denied that such an agreement ever existed.

■ First, when the parties disagree as to whether a standstill agreement existed, we decline to infer such an agreement merely from a silent docket. Docket sheets can be silent when significant work is being done on cases, and a silent docket sheet supported by only self-serving assertions by Plaintiff's counsel is insufficient to evince a formal agreement so drastically affecting a party's rights. At the very least, the record reflects that a status conference occurred sometime around mid-July 1995. Thus, if a standstill agreement exists at all, it first manifested itself in the Joint Motion filed on July 14, 1995, and prejudgment interest will not be tolled for any time prior to July 14. Thus, we examine the Joint Motion to determine whether the Joint Motion evinces the existence of a standstill agreement.

In this case, the district court found that the parties' 1993 alleged informal

*First Heights Bank FSB,* 229 F.3d 528, 542–44 (6th Cir.2000.).

oral agreement to suspend action on the case did not qualify as a "standstill agreement" for purposes of tolling the accrual of prejudgment interest. The court cited an absence of "affidavits or other evidence regarding the nature and scope of the alleged agreement," and noted that in every known instance "standstill agreements are formal agreements, usually memorialized in a written document." The court further found the parties' 1995 joint motion to remove the case from the active docket to be insufficient evidence of the 1993 agreement, stating "[t]his motion may support the argument that there was some type of agreement between the parties, but it is not sufficient to establish the existence of a valid agreement limiting the rights and remedies available to either party."

The district court failed, however, to consider the possibility that the Joint Motion operated, not merely as evidence of a prior standstill agreement, but as the instantiation of the agreement itself. If the Joint Motion *is* the standstill agreement, then the "nature and scope" of the agreement are easy to ascertain, and the agreement is in fact "memorialized in a written document."

■ Under Texas law, "standstill agreement" does not appear to be a term of art. Therefore, in looking for a standstill agreement, the best definition to use is the functional one provided by the Texas Supreme Court: "The purpose of a standstill agreement is normally to maintain the status quo and temporarily suspend or stop all aspects of a suit." *Johnson & Higgins,* 962 S.W.2d at 531. In other words, an agreement is a standstill agreement if it aims to maintain the status quo and suspend or stop all aspects of the suit. The defining characteristic of the agreement is its purpose. In this case, we find that the Joint Motion's purpose was similar to that of the standstill agreement in *Johnson & Higgins.* By removing the case from the active docket, all aspects of the suit were suspended or stopped, and the official status quo was maintained until the case was returned to the active docket slightly more than two years later. Although the parties could have continued to do minor informal work on the case while it was on the inactive docket, this would also have been possible under a more traditional bilateral standstill agreement of the *Johnson & Higgins* variety. If nothing else, the parties were not free to seek court action on the case without first moving to return the case to the active docket, a motion which may or may not have been uncontested.

It is true that many of the standstill agreements on record in Texas were reached much earlier in the litigation process than the agreement in this case, often even before suit was filed. For example, the trial court cited *Weatherford Int'l Inc. v. Baytech, Inc.,* No. 08–00–00372, 2001 WL 735753 at *7 (Tex.App.2001), in which the parties entered into a standstill agreement during a pre-litigation settlement conference. "A standstill agreement was reached and Weatherford paid nearly $500,000 to preserve Baytech's lease, averting the immediate damages Baytech feared, delaying Baytech's lawsuit, and allowing Weatherford to continue its investigation." *Id.* Thus, a bilateral agreement was sufficient to prevent the suit from being filed.

The trial court also cited *City of Los Angeles Dept. of Airports v. United States Dept. of Trans.,* 103 F.3d 1027 (D.C.Cir. 1997), wherein several airlines sued Los Angeles to avoid having to pay increased landing fees at Los Angeles International Airport:

The district court granted the City's motion to dismiss the airlines' complaint for failure to state a claim upon which relief could be granted ... Faced with the

possibility of being deprived of their landing privileges if they persisted in not paying the increased fee, many of the airlines entered into a so-called "standstill agreement" with the City in December 1993. The agreement, negotiated with the help of the Secretary of Transportation, provided that the airlines would pay the increased fee under protest and that the City would refund any portion of the fee that was eventually found unlawful. A lull in the fighting ensued.

*Id.* at 1029–1030. The standstill agreement came into effect after the court granted a 12(b)(6) motion, at a natural break in the litigation. Again, a bilateral agreement between the parties was sufficient to suspend all aspects of the case.

The agreement in the instant case involved the court because, unlike in the foregoing cases, any bilateral agreement of the parties would not have been sufficient to stop the case from moving forward. Suit had already been filed, and the court had its own responsibilities for ensuring that the case move forward expeditiously. Thus, the granting of the Joint Motion was more like a trilateral agreement that the case would be shelved while the criminal investigation was proceeding.

Nonetheless, there is no dispute as to the purpose of the Joint Motion. Indeed, the district court expressly found that "the parties informally agreed to suspend formal discovery and further action on the case while there was a possibility of criminal investigations in to the operations of ComAlloy ..., which were the subject matter of the lawsuit." The filing of the Joint Motion, signed by counsel for both parties establishes their agreement that the case be transferred to the court's inactive docket. "Inactive docket," by its very name, displays that the parties agreed to temporarily suspend activity on the case. Consequently, there is no substantive difference between the type of bilateral agreement discussed in *Johnson & Higgins,* and the Joint Motion in this case, and the district court should have concluded that the Joint Motion operated as a standstill agreement under Texas law.

Defendants argue that there was never any agreement to suspend or delay any legal rights during the period this case was placed on inactive status. That may be the case, but as explained above, once the parties agree to suspend activity, Texas law provides that the default rule is that prejudgment interest is tolled. *Johnson & Higgins,* 962 S.W.2d at 531.[13] In this case, it is undisputed that the parties agreed to place the case on inactive status. Moreover, there is no evidence suggesting that the parties had contracted an exception to

---

13. In *Johnson & Higgins,* the parties had entered into a valid agreement the terms of which provided that, with a few noted exceptions, "nothing in this agreement, or the recitals set forth herein, shall prejudice, influence or in any way affect any rights, liabilities, defenses, counterclaims or setoffs which may be asserted by either party hereto in this or any other proceeding." *Id.* at 531. Based on this language, the Texas Supreme Court found that "the standstill's application [was] narrow—it applie[d] only to limitations, laches, and other defenses. All of Kenneco's rights, which include prejudgment interest, were expressly reserved." *Id.* The court further noted, that "[t]he standstill agreement was silent with regard to prejudgment interest. The parties easily could have included a provision that prejudgment interest would abate during the specified standstill time period. Absent such provision, this court cannot imply one." *Id.* at n. 12 (citing *Tenneco Inc. v. Enterprise Products Co.,* 925 S.W.2d 640, 646 (Tex.1996)). Thus, because the standstill agreement expressly reserved the parties' rights, and because the standstill agreement did not expressly carve out an exception for the right to prejudgment interest, the Texas court found that prejudgment interest continued to accrue during the period the standstill agreement at issue was in effect. *Id.* at 531.

Texas's default rule.[14] Accordingly, we find that the district court erred in not tolling the award of prejudgment interest from the granting of the Joint Motion on July 17, 1995 until the case was placed back on the active docket on November 7, 1997.[15] Thus, the district court's decision not to toll the accrual of prejudgment interest during the period of the parties' standstill agreement will be reversed, and this case will be remanded for recalculating prejudgment interest.

F. Whether the District Court Erred in Determining the Proper Interest Rate to Apply When Computing Prejudgment Interest

### 1. Standard

As stated above, where, as here, the issue on appeal is not whether the court erred in deciding that prejudgment interest should be awarded, but instead is whether the district court correctly applied the law in determining the amount of prejudgment interest, a pure question of law is presented. Thus, the court will review this issue *de novo. See Piazza v. City of Granger,* 909 S.W.2d 529, 532 (Tex.Ct.App. 1995).

### 2. Analysis

■ On Defendants' cross-appeal, Defendants argue the district court erred in deciding the rate of prejudgment interest. The district court held that a rate of 6% was applicable for determining prejudgment interest. Defendants argue that the district court should have relied on binding authority from the Sixth Circuit holding that under Texas law prejudgment interest should be computed at the rate of 6% for time periods prior to September 1, 1997, and at the rate of 10% thereafter. *See FDIC v. First Heights Bank FSB,* 229 F.3d 528, 542–44 (6th Cir.2000.)

Both parties agree that *First Heights Bank* involved analogous facts, and that unless *First Heights Bank* is no longer good law, the holding in *First Heights Bank* applies. Defendants cite the general rule that "reported panel opinions are binding on subsequent panels." 6th Cir. R. 206(c). Exxon, however, contends that *First Heights Bank* is no longer binding, pursuant to the principles enunciated in *Hampton v. United States,* 191 F.3d 695 (6th Cir.1999). In *Hampton,* we held that in certain circumstances, when the original panel applied state law and the state courts subsequently issued opinions directly contradictory to the panel's earlier decision, the subsequent panel need not follow the previous panel decision. *Id.* at 701. Exxon argues that after *First Heights Bank* was issued, the Texas appellate courts issued two opinions which contradict *First Heights Bank,* and we are thus not bound to follow *First Heights Bank.*

After reviewing the two cases upon which Exxon relies, we find that they are not sufficiently clear to justify departing from the closely analogous *First Heights*

---

**14.** Interestingly, the dissent in *Johnson & Higgins,* rather than seeking to restrict the majority's expansion of the effect of standstill agreements, sought to expand their scope further still. The dissent argued that the standstill agreement at issue should have tolled the accrual of prejudgment interest *despite* the exception which maintained the "rights, liabilities, defenses, counterclaims [and] setoffs" of the parties. *Id.* As the dissent stated, "A plaintiff should not be entitled to prejudgment interest for a delay he has requested and agreed to." *Id.* at 536.

**15.** The prejudgment interest should be tolled from the date of the order granting the Joint Motion, rather than the Joint Motion itself. The Joint Motion evinces an agreement to request that the case be placed on inactive status, the court itself put that agreement into effect with its granting of the motion. In other words, tolling of the prejudgment interest begins, not on the date the standstill agreement was signed, but on the date the standstill agreement was put into effect.

*Bank*, and thus the district court erred by not applying the binding Sixth Circuit precedent.

First, Exxon relies upon *Academy Corp. v. Interior Buildout & Turnkey Constr., Inc.*, 21 S.W.3d 732 (Tex.Ct.App.2000). In *Academy Corp.*, the court held that

When the underlying contract does not specify the rate of interest, the rate of prejudgment interest is calculated at a rate of 6% if the amount payable can be ascertained. *See* Tex. Fin.Code Ann. § 302.002 (Vernon Supp.2000). A contract is one "ascertaining the sum payable" when it provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty, in light of the attending circumstances. *See Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 950 S.W.2d 371, 372–73 (Tex.1997). On the other hand, if the amount payable cannot be ascertained from the contract, prejudgment interest accrues at a rate of 10%. *See* Tex. Fin.Code Ann. § 304.003 (Vernon Supp.2000).

*Id.* at 744. Despite the fact that the Texas court purports to be citing the 2000 version of the relevant statute, it appears from the context that the *Academy* Court was actually citing from the earlier version of Tex. Fin.Code Ann. § 302.002.[16] Indeed, while the earlier version spoke in terms of "ascertaining the sum payable," the later version, which is the relevant version both in this case and in *First Heights Bank*, does not include the term "ascertaining the sum payable." Moreover, a recent Texas appellate court has declined to follow *Academy* because it appears to be in conflict with the current version of the applicable statute. *See Walden v. Affiliated Computer Services, Inc.*, 97 S.W.3d 303, 330 (Tex.Ct.App.2003) ("To the extent *Academy* stands for the proposition that the current version of Finance Code section 302.002 applies to a claim for prejudgment interest, we decline to follow it."). Accordingly, we find that *Academy Court* does not materially affect the *First Heights Bank* decision.

Similarly, the second case relied upon by Exxon also cites to the earlier version of § 302.002. *See Aguila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225 (Tex.Ct.App.2001). In *Aquila*, the court specifically cited the earlier version of § 302.002, without giving any explanation why it was not relying on the more recent version of § 302.002. *See id.* at 242–243.

*First Heights Bank* expressly based its decision on the later version of § 302.002, and found that "the changes to this provision [made in 2000] ... remove prejudgment interest from the interest authorized by statute." *First Heights Bank*, 229 F.3d at 543. Accordingly, the court held that prior to September 1, 1997, the interest rate determined by statute (6%) would apply, while after September 1, 1997, the

---

**16.** As the court noted in *First Heights Bank*, the previous prejudgment interest statutes provided that:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

*First Heights Bank*, 229 F.3d at 543. The later prejudgment interest statute provided that:

If a creditor has not agreed with an obligor to charge the obligor any interest, the creditor may charge and receive from the obligor legal interest at the rate of six percent a year on the principal amount of the credit extended by the creditor to the obligor beginning on the thirtieth day after the day on which the amount is due.

*Id.*

interest rate determined by common law (10%) would apply. Because Exxon has not produced any Texas case law directly contradicting this finding, and relying on the 2000 version of the applicable state, we find that the district court should have applied *First Heights Bank* in determining the applicable interest rate. Therefore, we will vacate that portion of the district court's August 21, 2001, decision on this issue, and remand for recalculation of pre-judgment interest.

## IV. CONCLUSION

For the reasons stated above, we AF-FIRM the denial of Exxon's motion for judgment as a matter of law, VACATE the calculation of prejudgment interest, and REMAND for the limited purpose of re-calculating prejudgment interest consistent with this opinion.